**FILED**

**SEP 1 6 2003**

CLERK

UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| STONEHILL FINANCIAL L.L.C, AS SUCCESSOR TO COAST BUSINESS CREDIT, A DIVISION OF SOUTHERN PACIFIC BANK, | ) ) ) ) ) | CIV. 03-4023 |
| Appellant, | ) ) | **ORDER OF REMAND** |
| vs. | ) ) | |
| THORNTON CAPITAL ADVISORS, INC., | ) ) ) | |
| Appellee. | ) ) ) | |

## I. INTRODUCTION

The Credit Store, Inc. (the Debtor) is a debtor involved in bankruptcy proceedings under Chapter 7 of the United States Bankruptcy Code (Bankruptcy Code).[1]  Pursuant to 11 U.S.C. § 365(a), the Debtor sought an order from the bankruptcy court[2] authorizing the rejection of a contract entered into with Thornton Capital Advisors, Inc./Recovery Partners II, L.L.C. (Thornton).  The bankruptcy court denied the motion, finding that the contract was not executory.  Stonehill Financial L.L.C., (Stonehill) as successor to Coast Business Credit

---

[1] The Debtor originally filed under Chapter 11, but converted to Chapter 7 on February 4, 2003.

[2] The Honorable Irwin N. Hoyt, Chief Bankruptcy Judge for the District of South Dakota.

(Coast),[3] a secured creditor of the Debtor, now appeals.  The court reverses the bankruptcy court's decision.

## II. FACTS AND PROCEDURAL BACKGROUND

Prior to the bankruptcy petition date and until the ultimate cessation of operations, the Debtor was involved in, among other endeavors, purchasing pools of defaulted credit card receivables.  The Debtor either serviced the receivables itself, by seeking collection debt, or sold the pools to third parties.  The credit card receivables primarily involved two classes of defaulted credit card debt:  (1) "converted receivables," where consumers agreed to repay certain defaulted amounts and would be issued a new credit card account in return; and (2) "unconverted receivables," where consumers refused to pay defaulted amounts and the Debtor sought collection of the debt through other means.

The Debtor and Coast entered into a Loan and Security Agreement on April 30, 1998, pursuant to which Coast provided the Debtor with a revolving line of credit.  The Debtor's obligations were secured by a perfected, first priority lien upon its assets; including accounts receivable, credit card receivables, equipment, general intangibles, inventory, and intellectual property.  Prior to entering bankruptcy, the Debtor defaulted under the Loan and Security Agreement by failing to make required payments to Coast.

Thornton entered into a "Repurchase Agreement" with the Debtor on December 31, 2001.  Under the terms of this agreement, Thornton acquired credit card receivables from the Debtor.  On January 4, 2002, Thornton entered into a Subordination Agreement whereby it

---

[3] On or about February 7, 2003, the Federal Deposit Insurance Corporation (FDIC) was appointed as receiver for Coast.  Subsequently, FDIC ceased serving as receiver and Stonehill became the successor to Coast.

subordinated all of its liens, interest, and right to payment to the rights of Coast.

Subsequently, as an accommodation, Thornton and the Debtor entered into a contract entitled

the "Master Servicing Agreement" (MSA) on June 25, 2002.  Pursuant to the MSA, Thornton

assumed the responsibility for servicing and collecting charged-off credit card receivables

owned by the Debtor.  Thornton was entitled to a set-up fee of a quarter-of- one percent of

the total amount of the credit card receivables, equaling approximately $900,000.  Thornton

was obligated to remit 50% of the funds collected on the accounts to the Debtor.  However,

Thornton was not required to remit any funds to the Debtor until it had recovered funds in

excess of the set-up fee.

On August 15, 2002, the Debtor filed a petition for relief under the Bankruptcy Code.

After the petition, Coast provided financing to the Debtor and permitted the use of cash

collateral.  All of the Debtor's obligations, which arose as a result of the postpetition loans,

are secured by a senior priority lien on various assets owned by the Debtor.  On November

11, 2002, apparently at the instigation of Coast, the Debtor moved to reject the MSA,

contending that the contract was detrimental to its creditors.  The bankruptcy court conducted

a hearing on December 11, 2002, at which Richard Budd (Budd), the Debtor's Chief

Restructuring officer, provided the only testimony.  The bankruptcy court entered an order

denying the Debtor's motion on January 27, 2003, after determining that the MSA was not an

executory contract.

## STANDARD OF REVIEW

"When a district court reviews a bankruptcy court's judgment, it acts as an appellate

court.  As with most appellate proceedings, the district court may review the bankruptcy

3

court's legal conclusions de novo, but the bankruptcy court's findings of fact shall not be set aside unless clearly erroneous." Wegner v. Grunewaldt, 821 F.2d 1317, 1320 (8ᵗʰ Cir. 1987) (citing In re Hunter, 771 F.2d 1126, 1129 n. 3 (8ᵗʰ Cir. 1985) (additional citation omitted)). The district court cannot make its own factual findings and "[i]f the bankruptcy court's factual findings are silent or ambiguous as to an outcome determinative factual question the district court "must remand the case to the bankruptcy court for the necessary factual determination." Id. (citation omitted).

## DISCUSSION

Stonehill argues that the bankruptcy court erred by applying the wrong legal standard to determine whether the MSA was an executory contract.  Further, Stonehill contends that the bankruptcy court's finding that the MSA was not an executory contract was erroneous because the Debtor, as of the bankruptcy petition date, owed remaining material obligations to Thornton.

### A.    The Legal Standard

An executory contract is defined as "a contract under which the obligations of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." In re Craig, 144 F.3d 593, 596 (8ᵗʰ Cir. 1998) (additional citations omitted). "The legislative history of § 365 states that the term executory contract 'generally includes contracts on which performance remains due to some extent on both sides.'" Cameron v. Pfaff Plumbing and Heating, Inc., 966 F.2d 414, 416 (8ᵗʰ Cir. 1992) (quoting S.Rep. No. 95-989, 95ᵗʰ Cong., 2d Sess. 58 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5844.)  Originally

4

formulated by Professor Vern Countryman, this definition which assists courts in determining whether a contract is executory was adopted by the Eighth Circuit in <u>Northwest Airlines, Inc., v. Klinger</u>, 563 F.2d 916, 917 (8th Cir. 1977). The bankruptcy court appropriately considered the Countryman definition in determining that the MSA was not an executory contract. Citing <u>Jensen v. Cont'l Financial Corp.</u>, 591 F.2d 477 (8th Cir. 1979), Stonehill argues that a courts inquiry into whether a contract is executory is determined by applying the Countryman definition, supplemented by a "functional" analysis, where a court must determine whether the estate will reap a benefit from the contract rejection. <u>Id</u>. at 481. On the other hand, Thornton interprets <u>Jensen</u> as requiring a court to first apply the Countryman test to analyze if the contract is executory, and, if the debtor has the option to assume or reject the contract, to subsequently determine whether the estate would benefit from the rejection. The court agrees with the approach suggested by Thornton.

Admittedly, <u>Jensen</u> indicates that the option to accept or reject an executory contract "is to be exercised in situations where the estate will be benefitted and not where the only effect of its exercise would be to convert a contractor's claim into a first priority expense of administration." <u>Id</u>. (citations omitted) Although <u>Jensen</u> indicates that this benefit analysis must be made prior to the rejection of an executory contract, this court does not read <u>Jensen</u> as requiring the benefit analysis be made in the initial determination as to whether or not a particular contract is executory. Whether the estate will receive a benefit in a particular situation is a separate analysis which must be performed prior to the bankruptcy court's approval of the rejection of an executory contract.

5

In Cameron, the Eighth Circuit held that "the phrase quoted in Bildisco--that 'performance remains due to some extent'--is equivalent to the standard we adopted from Professor Countryman in Klinger and Jenson--that failure to complete the remaining performance 'would constitute a material breach.'" 966 F.2d at 416 (quoting NLRB v. Bildisco & Bildisco, 465 U.S. 513, 522 n. 6, 104 S.Ct. 1188, 1194 n. 6, 79 L.Ed.2d 482 (1984)). Notably, neither Cameron nor Craig reference the "functional" approach which Stonehill believes supplements the Countryman test. While Cameron does not affirmatively reject the "functional" test, this court is not persuaded such an analysis must be included in the initial executory contract determination. The bankruptcy court applied the appropriate legal standard.

## B.    Remaining Material Obligations

The only other issue for this court to consider is whether, as of the date the Debtor entered into bankruptcy, see In re Newcomb, 744 F.2d 621, 624 (8th Cir. 1984)(citation omitted); see also Cameron, 966 F.2d at 416 (stating the issue as whether material unperformed obligations by both parties to the contract when the debtor filed its bankruptcy petition), material unperformed obligations by both the Debtor and Thornton under the MSA remained on the date that the Debtor entered into bankruptcy. Stonehill argues that the Debtor's remaining obligations include the duty to: (1) provide future forward flow of fresh accounts; (2) recall non-conforming receivables; (3) pay collection and set-up fees; (4) provide indemnification; and (5) provide assistance and documentation when necessary. The Debtor's obligation to provide a forward flow of fresh accounts, by itself, renders this contract executory and therefore the court need not address each of Stonehill's arguments.

6

Section 2.01 of the MSA states that "[Thornton] shall receive the Serviced Portfolios, and, acting alone or through one or more subservicers, shall manage, service, collect and administer all Receivables making up the Serviced Portfolios ..." The MSA defines the term "Serviced Portfolio" in the following manner:

> "Serviced Portfolio" means initially two pools of Receivables that are being committed by the [Debtor]. The first pool is made up of approximately $23,243,500 of charged-off credit cards issued through the [Debtor]'s balance transfer program. The second pool is made up of approximately $352,428,251 of charged-off consumer Receivables that were acquired by the [Debtor] from a Selling Person (the first and second pools shall be referred to hereinafter as the "Initial Pools"). The third pool shall be a forward flow of all of the [Debtor]'s fresh charged off credit cards until a maximum of Sixty Million (60,000,000) Dollars has been delivered. These Receivables will be forwarded to [Thornton] within thirty (30) days from time of charge-off (180 days delinquent). The forth [sic] pool is made up of approximately $200 million of various Receivables that may be forwarded to [Thornton] upon the [Debtor] determining the proper legal status of the pool or individual accounts.

Thornton argues that the Debtor's obligation to deliver the third and fourth pools of receivables is not contained in any operative provision of the MSA, only in a definition, and that it is not clear that the obligation can be derived from the definition. The court disagrees. At a minimum, the contract clearly obligates the Debtor to forward to Thornton the third pool of receivables comprised of fresh charged-off accounts.

Apparently, there is no dispute that the "Initial Pools" of receivables were transferred by the Debtor to Thornton for servicing prior to the petition date. However, Thornton argues that there is no evidence that the third and fourth pools of receivables have not already been transferred to Thornton. Admittedly, there is no direct testimony regarding whether the Debtor has already forwarded the third and fourth pools of receivables to Thornton.

However, Budd's testimony concerning the Debtor's obligation under the MSA to continue transferring accounts to Thornton, in addition to the fact that Stonehill is pursuing this appeal to prevent the forwarding of the third and fourth pools of receivables, leaves little doubt that the Debtor has not satisfied the obligation to provide additional accounts to Thornton.

Finally, Thornton argues that even if the Debtor was obligated to forward the $60 million third pool to Thornton, the Debtor's failure to effect that transfer would not be a material breach of the MSA. The court disagrees. The Debtor is obligated to forward a substantial amount of fresh credit card receivables and Thornton is contractually bound to service those receivables as well as the receivables which comprise the Initial Pools. Performance, to a large extent, appears to remain due on both sides of the MSA. It is also the opinion of this Court that the remaining obligation to forward fresh credit card receivables is material and therefore the MSA is executory.

## C. Thornton's Additional Arguments

In response to questioning by Thornton's counsel, Budd testified that he was not aware of any remaining material obligations owed from the Debtor to Thornton under the MSA. The bankruptcy court relied upon this testimony in finding that the MSA was not an executory contract. Thornton similarly relies upon this testimony on appeal. Considering Budd's entire testimony, as well as the entire record in this matter, reliance upon this one particular statement is unwarranted. Although the questioning was not necessarily misleading, Budd's responses to this particular line of questioning indicates that he was confused and the court does not place a great amount of weight upon his statement that the Debtor had no remaining material obligations to Thornton.

8

Thornton argues that this case is not about whether the Debtor must continue to perform under the MSA, rather, the real issue is Stonehill's desire to have the Debtor reject the entire MSA so that the "Initial Pools" of receivables which were transferred to Thornton for servicing can be sold. Asserting numerous reasons, Thornton additionally argues that the standards for rejection cannot be met in this case. Stonehill appears to acknowledge the impropriety of seeking to undo any performance Thornton has already rendered to the Debtor. Regardless, these issues are beyond the scope of this appeal. The task of this court is simply to determine whether the bankruptcy court erred in finding that the MSA was not executory. Any additional matters related to the appropriateness of the Debtor's desire to reject the MSA must first be addressed by the bankruptcy court. Accordingly, it is hereby

ORDERED that the Order Denying Debtor's Motion for and Order Authorizing Rejection of Executory Contract Pursuant to 11 U.S.C. § 365, is REVERSED. This matter is remanded to the bankruptcy court for further consideration consistent with this opinion.

Dated this 16th day of September, 2003.

BY THE COURT:

ANDREW W. BOGUE
SENIOR DISTRICT JUDGE